**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROBERT ZOMOLOSKY, derivatively on behalf of E.I DU PONT DE NEMOURS AND COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ELLEN KULLMAN, LOIS D. JULIBER, CURTIS J. CRAWFORD, RICHARD H. BROWN, ELEUTHERE I. DU PONT, MARILLYN A. HEWSON, ROBERT A. BROWN, BERTRAND P. COLLOMB, ALEXANDER M. CUTLER, LEE M. THOMAS, LAMBERTO ANDREOTTI, THOMAS L. SAGER, WILLIAM K. REILLY, SAMUEL W. BODMAN AND JOHN T. DILLON,<br><br>Defendant.<br><br>and<br><br>E. I. DU PONT DE NEMOURS AND COMPANY,<br><br>Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>C.A. No.<br><br><br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED DERIVATIVE COMPLAINT**

Plaintiff Robert Zomolosky ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant E. I. Du Pont De Nemours and Company ("DuPont" or the "Company") against current members of its Board of Directors (the "Board"), certain of DuPont's current officers and certain of its former directors (collectively "Defendants") and alleges upon personal knowledge as to his own acts, and as to all other matters upon information and belief, as follows:

## SUMMARY OF THE ACTION

1.      Plaintiff brings this action derivatively on behalf of the Company relating to the August 1, 2012 jury verdict finding that DuPont willfully infringed on  Monsanto Company and Monsanto Technology LLC's (collectively, "Monsanto") patent covering its Roundup Ready soybeans and awarding Monsanto $1 billion in damages.  The verdict arose from a complaint filed by Monsanto against DuPont in the United States District Court for the Eastern District of Missouri, Civil Action No. 09-00686 ("Missouri District Court" or "Missouri Monsanto litigation").  This action also relates to the finding by the Missouri District Court that DuPont, in connection with its counterclaims against Monsanto's Roundup Ready patent litigation, made false and misleading representations to the Missouri District Court and the public during and after the trial regarding issues critical to the Company's breach of contract defenses and antitrust counterclaims.

2.      The Missouri Monsanto litigation involved a matter of central importance to DuPont—its attempt to develop food crops that are resistant to the world's most popular herbicide, Glyphosate.  Glyphosate was originally developed by Monsanto.  Monsanto's patent protection for Glyphosate has lapsed, but it still sells much of the world's supply under the brand name, "Roundup." The world's farmers can achieve much higher crop yields and farm more efficiently if they can use Glyphosate without harming food crops, such as soy. Scientific breakthroughs by Monsanto have created genetically modified seed products that exhibit "traits" that are resistant to Glyphosate, and thus will not be harmed by it.  Monsanto markets the Glyphosate-resistant seed products under the brand name, "Roundup Ready", and has patents protecting this technology through 2014.  DuPont and Monsanto are bitter rivals.

DuPont's subsidiary, Pioneer Hi-Bred International, Inc. ("Pioneer") licensed the Roundup Ready trait from Monsanto in 2002, and sells seeds using it.

3.     Beginning in or about 2005, Pioneer and DuPont began devoting enormous time and effort to developing a competing herbicide-resistant technology, known as Optimum GAT or "OGAT."  If OGAT could be perfected, it might replace Roundup Ready, or at least allow DuPont to take away a sizeable portion of Monsanto's Roundup Ready business.  The success of this project was crucial to DuPont's agricultural business, which by 2007 was DuPont's largest segment, accounting for $6.8 billion in revenue. Between 2005 and 2007, DuPont spent almost $4 billion on research and development, much of which was devoted to the development of OGAT.  The centrality of this effort to DuPont's business was clear. By about 2008, roughly 90% of soybean and cotton seeds carried the Roundup Ready trait, with corn seeds almost as high. DuPont's competitive disadvantage was  admitted by an attorney for DuPont in 2010, who said:

> Farmers will not buy soybeans without Roundup Ready in it. So, that gives Monsanto an amazing amount of leverage. A seed company can't stay in business without offering seeds with Roundup Ready in it, so if they want to stay in that business, essentially they have to do what Monsanto tells them to do,[1]

4.     DuPont's Board and management would and should have paid careful attention to OGAT and the intense competition between Monsanto and DuPont, as DuPont had been losing ground for many years.   For example, in 2001, DuPont had 40 percent share of the U.S. corn market to Monsanto's 10 percent.  But by 2008, Monsanto had taken 36 percent of that market to DuPont's 30 percent.

---

[1]  "Monsanto GMO Ignites Big Seed War", January 12, 2010, available at:
http://www.npr.org/templates/story/story.php?storyId=122498255

5.     On September 23, 2008, DuPont named defendant Ellen J. Kullman ("Kullman") as its new Chief Executive Officer, effective January 2009 and as President and a director immediately.  Kullman had been with DuPont since 1988, having been a member of DuPont's Office of the Chief Executive and was under severe pressure to affect a turnaround. When Kullman was named CEO, DuPont shares were trading at $42 per share; five months into her tenure, in March 2009, the stock price had fallen as low as $16 per share. One way of reviving DuPont's fortune would be for it to employ OGAT as an alternative to Roundup Ready.  For years, DuPont had been promising investors that OGAT was on target to be commercialized by 2009.  However, in reality, DuPont knew that OGAT was a failure as stand-alone product.  In fact, in 2008, DuPont's former CEO, Charles Holliday, Jr., called Monsanto's CEO, Hugh Grant, to suggest the two companies collaborates technologies, including a project to improve soybean oil.  During that conversation Holliday admitted his company DuPont was falling behind in the race to engineer a better soybean.  As a jury was later to find, DuPont began as early as 2008 to engage in efforts to create an "alternative" to its failed program to develop OGAT as a stand-alone product by combining or "stacking" OGAT with Roundup Ready.   Kullman's endorsement of this process was part of DuPont's effort at this time to create an image of an innovative, growing company.

6.     Monsanto was carefully monitoring DuPont's actions, as Monsanto did not believe it had granted Pioneer any such stacking rights under its license, and such action would be a patent infringement.   Although Monsanto initiated a complaint process with Pioneer as early as December 2008, evidence mounted in early 2009 that DuPont and Pioneer were moving full speed ahead on their stacking plans.  Indeed, Pioneer at a March 2009 investor conference even described DuPont's potential new product as "Optimum GAT/RR."

7.     Monsanto filed suit against DuPont and Pioneer on May 4, 2009 claiming breach of contract and patent infringement ("the Missouri Monsanto litigation").[2]  The case proceeded to a jury trial.  On August 1, 2012, the jury returned a $1 billion compensatory damages verdict against the defendants, finding willful infringement.  Punitive damages, yet to be determined, may bring the award to $3 billion, *which is almost all of the cash DuPont carries on its balance sheet.*

8.     In connection with verdict, Monsanto's General Counsel stated in a press release:

> Importantly, this verdict highlights that all companies that make early and substantial investments in developing cutting edge technology will have their intellectual property rights upheld and fairly valued. This verdict also underscores that DuPont's unauthorized use of the Roundup Ready technology was both deliberate and aimed at rescuing its own failed technology.
>
> The materials uncovered from DuPont files during this case highlight that **DuPont's senior leaders were actively working to hide the fact their OGAT technology had failed and were using elaborate schemes to cover that up with the unlicensed use of our technology**.  They knew the OGAT technology didn't work for years, but opted to tell a much different story to their customers and to Wall Street. It is deeply **disappointing that repeated requests to DuPont's leadership and board to investigate their own internal actions were not addressed and corrected, which ultimately required the matter go to trial.**

9.     DuPont's Board's knowing acquiescence in this course of unlawful conduct is more than "disappointing"--it is an affirmative breach of fiduciary duty.  The DuPont Board

---

[2]    The suit marked the second time Monsanto had been involved in litigation with Pioneer over claims of unlawful "stacking" and contractual breaches.  The first suit, which involved insect-resistant genetically modified corn, had resulted in a jury verdict for Monsanto and sanctions being awarded against Pioneer. *Pioneer Hi-Bred Int'l v. Monsanto Co.,* 2001 U.S. Dist. LEXIS 25108 (E.D. Mo. Jan. 2, 2001).  The Court ruled that: "Once suit was filed, Pioneer engaged in a systematic pattern of deceitful behavior to prevent Monsanto from discovering facts known by Pioneer to exist, to prevent Monsanto from prevailing in its defense of the suit and its counterclaims. This behavior was not isolated, but pervaded the litigation well into the trial." *Id.* at *63.

could not have believed that DuPont was justified in stacking OGAT with Roundup Ready, because there was no credible evidence it had such rights.  The Board's loyalty should be to the corporation, not to management.  Here, the DuPont Board lost sight of its mandate and its responsibilities, and acquiesced in unlawful legal maneuvers and deceptive public statements in conscious disregard of its obligations.  The Board members face a substantial likelihood of liability.  Under applicable Delaware law, this action may be brought by the shareholder Plaintiff herein if a demand addressed to the DuPont Board to bring this suit would be "futile."  Having created DuPont's legal woes (along with management), the Board cannot be deemed independent enough to consider a demand to bring this action.  A demand would obviously be futile.

10.     DuPont's legal exposure did not end with the jury verdict.  On November 16, 2012, the District Court issued a memorandum and order unsealing certain documents which included the District Court's December 21, 2011 Sanctions Order ("Sanctions Order") (Ex. A).  In the Sanctions Order, the Missouri District Court determined, among other things, that during the period from 2002 through 2008, DuPont and its inside and outside counsel knew that the 2002 License Agreements with Monsanto prohibited DuPont from stacking and commercializing glyphosate-tolerant traits and that DuPont was infringing on Monsanto's patent.

11.     The Sanctions Order held that DuPont and its inside and outside lawyers had perpetrated a fraud on the District Court and the public by making false statements regarding the terms of the 2002 License Agreements.  The District Court held that:

> The Court finds that this email, Monsanto's exhibit O, conclusively shows that Defendants *have perpetrated a fraud against the Court* by stating to the Court, repeatedly, that they always believed that under the license agreements, they always had the right to stack RR traits with OGAT traits.  Defendants have perpetuated a fraud upon the Court by knowingly making false factually

statements to the Court in order to further their argument for contract reformation. This conduct constitutes an abuse of the judicial process and is sanctionable.

12.     The Sanctions Order further found that DuPont's "fight-to-the-death" mentality had clouded Defendants' judgment and that notwithstanding the "clear and unmistakable content of the documents that clearly and convincingly show that Defendants knew of the 2002 [L]icense [A]greements stacking restrictions, they nevertheless persisted *to this day,* in advancing false claims that they always believed that they had the right to stack RR and OGAT traits and commercialize this stack. They claimed excuse is not plausible. Defendants have knowingly committed a fraud upon the Court."

13.     The Sanctions Order found that DuPont showed no remorse for its wrongdoing.

14.     Confronted with this credible evidence, Defendants failed to make good faith efforts to prevent or remedy the fraud being committed on the Court and the public, and, instead, engaged in a cover-up. Following the sanctions ruling, the Board of Directors increased Kullman's salary.

15.     As alleged in detail below, in violation of their fiduciary duties, Defendants acted in conscious disregard of the fact that the Company was violating a contract and  a patent and that it continued to make misrepresentations to the Missouri District Court. Instead of fulfilling their fiduciary responsibilities, Defendants made no good faith effort to prevent or remedy the situation, and engaged in affirmative actions to cover-up the unlawful conduct. Defendants' conduct resulted in damage to DuPont's reputation and exposed the Company to material civil liability and Court sanctions.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. §1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs and the dispute is completely between citizens of different states.

17.    This action is not brought collusively to confer jurisdiction on this Court that it otherwise would lack.

18.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§1391 because DuPont is incorporated in Delaware and because acts and offenses pertinent to the causes of action stated herein were committed in the State of Delaware.

## THE PARTIES

19.    Plaintiff is a current DuPont shareholder and has been a shareholder throughout the time of the misconduct complained of herein.  Plaintiff is a citizen of Pennsylvania.

20.    Nominal defendant DuPont was founded in 1802 and was incorporated in Delaware in 1915.  The Company's corporate headquarters are located at 1007 Market Street, Wilmington, Delaware.  DuPont is a citizen of Delaware.

21.    Defendant Ellen Kullman ("Kullman") has been Chief Executive Officer of DuPont since January 2009.  She has served as a director since 2008 and Chair of the Board of Directors since 2009. Kullman was president of DuPont from October 1 through December 31, 2008. Prior to that, she served as executive vice president and a member of the Company's Office of the Chief Executive. Kullman signed the Company's Forms 10-K for the years ended December 31, 2010 through 2011.  Kullman is a citizen of Delaware.

22.    Defendant Lois D. Juliber ("Juliber") has served as a DuPont director since 1995. Juliber is a member of the Company's Compensation and Corporate Governance committees. Juliber signed the Company's Forms 10-K for the years ended December 31, 2010 through 2011. Juliber is a citizen of Delaware.

8

23.     Defendant Curtis J. Crawford ("Crawford") has served as a DuPont director since 1998.  Crawford is a member of the Company's Compensation and Science and Technology committees.  Crawford signed the Company's Forms 10-K for the years ended December 31, 2010 through 2011.  Crawford is a citizen of New York.

24.     Defendant Richard H. Brown ("Richard Brown") has served as a DuPont director since 2001.  Richard Brown is a member of the Company's Compensation and Corporate Governance committees.  Richard Brown signed the Company's Forms 10-K for the years ended December 31, 2010 through 2011.  Richard Brown is a citizen of Texas.

25.     Defendant Eleuthere I. du Pont ("E. du Pont") has served as a DuPont director since 2006.  E. du Pont is a member of the Company's Audit and Science and Technology committees.  E. du Pont signed the Company's Forms 10-K for the years ended December 31, 2010 through 2011.  E. du Pont is a citizen of Delaware.

26.     Defendant Marillyn A. Hewson ("Hewson") has served as a DuPont director since 2007.  Hewson is a member of the Company's Environmental Policy, Audit and Compensation committees.  Hewson signed the Company's Forms 10-K for the years ended December 31, 2010 through 2011.  Hewson is a citizen of Maryland.

27.     Defendant Robert A. Brown ("Robert Brown") has served as a DuPont director since 2007.  Robert Brown is a member of the Company's Environmental Policy, Audit and Science and Technology committees.  Robert Brown signed the Company's Forms 10-K for the years ended December 31, 2010 through 2011.  Robert Brown is a citizen of Massachusetts.

28.     Defendant Bertrand P. Collomb ("Collomb") has served as a DuPont director since 2007.  Collomb is a member of the Company's Environmental Policy and Corporate

Governance committees.  Collomb signed the Company's Forms 10-K for the years ended December 31, 2010 through 2011.  Collomb is a citizen of The Republic of France.

29.     Defendant Alexander M. Cutler ("Cutler") has served as a DuPont director since 2008.  Cutler is a member of the Company's Compensation and Corporate Governance committees.  Cutler signed the Company's Forms 10-K for the years ended December 31, 2010 through 2011.  Cutler is a citizen of Ohio.

30.     Defendant Lee M. Thomas ("Thomas") has served as a DuPont director since 2011.  Thomas is a member of the Company's Environmental Policy and Audit committees.  Thomas signed the Company's Forms 10-K for the years ended December 31, 2010 through 2011.  Thomas is a citizen of Georgia.

31.     Defendant Lamberto Andreotti ("Andreotti") has served as a DuPont director since 2012.  Andreotti is a member of the Company's Audit committee.  Andreotti is a citizen of New York.

32.     Defendant Thomas L. Sager ("Sager") is Senior Vice President and General Counsel of DuPont, positions he has held since July 2008.  Sager oversaw and directed the litigation with Monsanto.  Sager is a citizen of Delaware.

33.     Defendant William K. Reilly ("Reilly") served as a DuPont director from 1993 until 2012.  During that time Reilly served as a member of the Company's Corporate Governance, Environmental Policy and Science and Technology committees.  Reilly signed the Company's Forms 10-K for the years ended December 31, 2010 through 2011.  Reilly is a citizen of Virginia.

34.     Defendant Samuel W. Bodman ("Bodman") served as a DuPont director from 2009 until 2011.  During that time Bodman served as a member of the Company's

Compensation, Corporate Governance, Environmental Policy and Science and Technology committees. Bodman signed the Company's Forms 10-K for the year ended December 31, 2010. Bodman is a citizen of Florida.

35.     Defendant John T. Dillon ("Dillon") served as a DuPont director from 2004 until 2011.  During that time Dillon served as a member of the Company's Audit, Compensation and Science and Technology committees.  Dillon signed the Company's Forms 10-K for the year ended December 31, 2010.  Dillon is a citizen of New York.

36.     Defendants Kullman, Juliber, Crawford, Richard Brown, E. du Pont, Hewson, Robert Brown, Collomb, Cutler, Thomas, Andreotti, Reilly, Bodman and Dillon are sometimes referred to herein as the "Director Defendants."   The Director Defendants together with defendant Sager are referred to herein as the "Defendants."

37.     By reason of their positions as officers, directors or former directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Defendants owed to the Company and its shareholders the fiduciary obligations of loyalty and due care.

38.     By knowingly engaging in and/or knowingly acquiescing in the wrongful conduct complained of herein, each of the Defendants breached the fiduciary duties that each of them owed to DuPont and its shareholders and caused DuPont to incur billions of dollars in damages and other injuries more fully described below.

39.     The Defendants engaged in the wrongdoing complained of herein.   Such participation involved, among other things, planning and creating (or causing to be planned and created), proposing (or causing the proposal of) and authorizing, approving and acquiescing in the conduct complained of herein.

## JURISDICTION

40.    This Court has jurisdiction over this action pursuant to 10 Del. C.  341.

41.    This Court has jurisdiction over the Defendants as officers and directors of a Delaware corporation under 10 Del. C. 3114 and/or under 10 Del. C. 3104.

42.    This Court has jurisdiction over DuPont pursuant to 10 Del. C. 3111.

## SUBSTANTIVE ALLEGATIONS

43.    Monsanto and DuPont are major competitors and are the two largest companies in the $34 billion commercial seed market.

44.    DuPont is a world leader in science and innovation across a range of disciplines, including agriculture and industrial biotechnology, chemistry, biology, materials science and manufacturing.  The Company operates globally and offers a wide range of innovative products and services for markets including agriculture and food, building and construction, electronics and communications, general industrial, and transportation. The Company consists of 13 businesses which are aggregated into seven reportable segments based on similar economic characteristics, the nature of the products and production processes, end-use markets, channels of distribution and regulatory environment.

45.    Monsanto develops, manufactures, licenses, and sells agricultural biotechnology, agricultural chemicals, and other agricultural products.  Monsanto's scientists developed Glyphosate (marketed as "Roundup"), the most widely-used herbicide in commercial farming. The use of herbicides is essential in farming, as weeds crowd out useful plants, increase costs, and create a need for frequent crop rotations.  The downside of using Glyphosate has been that it may kill both weeds and useful crops.  Monsanto identified plants that were "resistant" to Glyphosate, and genetically isolated this "trait."  It then genetically modified soybean and other

seeds to "express" this trait, making them resistant to Glyphosate as well.  The resultant seed product is marketed by Monsanto as "Roundup Ready."  The name signifies that the plants the seeds will produce are already resistant to Roundup.  Monsanto no longer has patent protection for Roundup, but still sells huge quantities of it.  It does have patent protection for Roundup Ready, which extends to 2014.  Monsanto licenses Roundup Ready to many seed companies, including DuPont through its Pioneer subsidiary.

46.     Monsanto's licensing agreements contained, among other things, "field of use" limitations that exclude from the scope of the license grant any right to combine certain of Monsanto's patented trait technologies with certain technologies developed by other companies – a practice known in the industry as "stacking".

47.     In 2002, Monsanto entered into non-exclusive license agreements (the "2002 License Agreement") with DuPont and Pioneer, giving Pioneer the right to use the Roundup Ready technology (i.e. manufacture and sell soybean and corn seed with the resistant traits) in exchange for the payment of royalties.  In order for Pioneer to develop its necessary seed lines, the 2002 License Agreement obligated Monsanto to deliver to Pioneer certain biological materials and proprietary technical information.

48.     In 2006, as competition to improve soybean yields accelerated, DuPont and its subsidiary Pioneer unveiled its own Glyphosate-tolerant trait technology, known as Optimum® GAT® ("OGAT").  Because Monsanto was dominating the modified seed market, DuPont's ability to develop and commercialize OGAT was crucial to its ability to compete and thrive. DuPont's Board would have followed OGAT development very closely.

49.     On March 2, 2006 DuPont stated in a press release that: "DuPont expects the Optimum GAT trait to receive full U.S. registration for use in soybeans and corn as early as 2009."

50.     On March 16, 2006,  Pioneer's President said, "GAT is really a more effective Glyphosate tolerant product. It has versatile modes of action, it has full spectrum weed control without the threat of plant injury, and it's got greater yield potential than those products that we are seeing in the marketplace today."

51.     DuPont's Communications Director Doyle Karr was quoted as saying shortly thereafter that DuPont said it will gradually retire its Roundup Ready varieties and replace them with Optimum GAT. Karr said, "Almost all herbicide resistant soybean varieties currently carry the Roundup Ready gene. With the commercialization of Optimum GAT, we hope to capture some of the Roundup Ready market."

52.     Throughout 2007, DuPont and Pioneer executives assured that they were "on track"  for the commercialization of OGAT-protected soybeans in 2009.

53.     On July 17, 2008, DuPont issued a press release highlighting the extraordinary importance of GAT to farmers and to DuPont:  It stated in pertinent part:

> DuPont today announced that it has received United States regulatory approval of its proprietary herbicide tolerance trait, the Optimum® GAT® trait in soybeans -- bringing the company a step closer to further extending the performance advantage of its Pioneer® brand soybean seed.
>
> "This milestone brings an innovative technology closer to farmers' fields," said James C. Borel, DuPont group vice president. "The Optimum® GAT® trait combined with our industry-leading genetics and other complementary technologies, ***will help soybean farmers maximize yields and give them a new level of weed control flexibility***. The U.S. regulatory approval of the Optimum® GAT® trait in soybeans is key to DuPont efforts ***to increase soybean yields by 40 percent over the next 10 years."***

DuPont business Pioneer Hi-Bred recently launched its new high-yielding Y Series soybean varieties for 2009. The entire line has demonstrated a five percent yield advantage against key competitor varieties with some varieties yielding six to ten percent better than competitors. These top-performing new varieties were developed with exclusive Accelerated Yield Technology (AYT™) and ***will serve as a strong platform for the Optimum® GAT® trait***

Pioneer® brand soybeans have been the brand leader since 1989 and have gained six points of market share over the last eight years. Pioneer will grow its soybean market share in 2008 and expects that new technologies like the Y Series and the Optimum® GAT® trait will keep its share growing into the future.

The first-ever agricultural trait, developed through proprietary DuPont gene shuffling technology, the Optimum® GAT® trait will provide broader spectrum weed control without compromising crop safety.

With these new herbicide options, growers will have tools to help manage tough to control weeds, including the growing list of glyphosate resistant weeds, in addition to maximizing yield potential. DuPont is planning demonstration plots in 2009 and 2010 and will introduce commercial soybean varieties with the Optimum® GAT® trait in 2011.

54.    That DuPont might be able to increase crop yields by 40% was no small thing, given the world's growing population and growing consumption of basic food products.  Added to that was growing demand for corn, which is used to make ethanol.  Food shortages had become a major concern.  As the agriculture publication *Superproducer* reported in January 2009:

This upheaval represents an opportunity for companies like Iowa-based Pioneer…A DuPont subsidiary, Pioneer grossed $3.3 billion in 2007, primarily from the sale of bioengineered seeds; its chief rival, Monsanto, topped $11 billion in 2008. These businesses are based on the promise that science can help farmers boost yield. ***"We have to feed the world,"*** says William Niebur, Pioneer's vice president of crop genetics R&D, "***and we can, by increasing productivity per acre.*** And if we bring people food, there will be political stability, which leads to economic growth."

55.    On December 4, 2008, DuPont's management team convened a public "Update Call" to discuss their accomplishments, and DuPont's future.   On the call were defendant Kullman and Jim Borel, Group VP of  DuPont's Production Agriculture Business.  Borel stated, without contradiction from Kullman:

> Our prelaunch technology trials including Optimum AcreMax and Optimum GAT corn and soybean traits all showed very promising results as well and we intend to update our production Ag R&D pipeline advancements early next year…We're also on track to deliver critical product ramp-ups of our Y Series soybean seed and the Rynaxpyr insecticide and we plan to exploit the synergy of our seed and crop protection products as the teams closely collaborate in advance of the Optimum GAT corn launch in 2010

56.    Unbeknownst to the public, OGAT had failed as a stand-alone product by that point.  According to Monsanto in the Missouri Monsanto litigation, Monsanto obtained a January 2009 Pioneer video in which: "Just more than 1 minute into a Pioneer video, Pioneer's soybean research director said the Optimum GAT technology posed an 'unacceptable risk to farmers' and they planned to stack the technology with Roundup Ready."

57.    The failure of OGAT and the planned unauthorized GAT/Roundup combination would have been reported and discussed with the Board by Kullman and others.  As early as December 2008 Monsanto had made it clear to Pioneer and DuPont that it considered any stacking plans to be "unauthorized", a signal that it would enforce its patent rights and contractual rights, exposing DuPont to billions in actual and punitive damages.    Indeed, as Monsanto reported in an April 3, 2009 SEC quarterly filing on Firm 10-Q:

> On Dec. 23, 2008, we entered into a dispute resolution process with Pioneer Hi-Bred International, Inc., a wholly owned subsidiary of E. I. du Pont de Nemours and Company, to address issues regarding the unauthorized use of our proprietary technology. Pioneer has announced plans to combine or stack their Optimum® GAT® trait in soybeans with our patented first generation ROUNDUP READY technology, contrary

> to their previously disclosed plans to discontinue use of soybean varieties containing our technology and pursue the Optimum® GAT® trait alone. We believe that Pioneer is not authorized to make this genetic combination, and we are seeking to prevent non-consensual use of our proprietary technology absent appropriate terms including compensation for providing access to such technology.

58.     Despite the lack of evidence that Monsanto was incorrect in its position, and despite DuPont's huge potential exposure, the Board did not step in to remedy the situation. Instead, it permitted the wrongful conduct to continue, and it permitted DuPont to maintain for years the improper and illegal position that it had the right to stack OGAT and Roundup Ready. The Board was thus an accomplice to a fraud upon the Court, either intentionally or recklessly.

59.     On May 4, 2009, Monsanto filed a lawsuit in the United States District Court for the Eastern District of Missouri alleging claims for patent infringement, breach of contract and unjust enrichment in order to prevent the unauthorized use of its Roundup Ready technology in corn and soybeans.  Monsanto alleged that DuPont violated Monsanto's contractual and patent rights by producing certain stacked seed products, combining DuPont's Optimum GAT trait with Monsanto's Roundup Ready trait in soybeans.  ("Missouri Monsanto litigation").

60.     On June 16, 2009, DuPont filed an answer and counterclaim seeking injunctive relief, damages and specific performance asserting a claim of license as well as the invalidity or unenforceability of the patent asserted by Monsanto, and also claiming alleged anticompetitive behavior relating to traits for corn and soybeans.

61.     Since a finding that Monsanto's patent was valid and enforceable and had been infringed upon would moot the majority of DuPont's allegations of anticompetitive conduct, the District Court, on Sept. 16, 2009, severed the antitrust defense interposed by DuPont for a separate, subsequent trial following Monsanto's case for patent infringement and license breach.

62.     On Oct. 23, 2009, the Court heard Monsanto's motion for judgment on the pleadings to declare DuPont and Pioneer in breach of their corn and soybean licensing agreements with Monsanto. On Jan. 15, 2010, the Court granted Monsanto's motion declaring that DuPont and Pioneer were not licensed to create a product containing Roundup Ready and Optimum GAT traits stacked in combination.

63.     On Dec. 21, 2011, the Court issued an order granting Monsanto certain relief, which order was filed under seal.

64.     In July 2012, trial commenced in the Monsanto/Missouri litigation. During the trial, Monsanto's attorneys told the jury, that DuPont had been trying to come up with its own system to rival Roundup Ready and began touting its Optimum GAT system, but then acknowledged it was failing and posed an "unacceptable risk" to farmers.  Monsanto CEO Hugh Grant told the jury that DuPont approached the Company, asking for the ability to combine or "stack" the GAT technology with the Roundup Ready technology. Monsanto said it would give Pioneer full rights to the technology for a lump sum of $1.5 billion, but DuPont declined the offer.

65.     On June 28, 2012 the District Court issued a Protective Order (the "June 28, 2012 Order") which required that several memorandum opinions and orders were to be filed under seal.  The June 28, 2012 Order was entered to "avert the possibility that media coverage might taint or prejudice the patent jury pool".  The documents that were filed under seal included: a June 6, 2012 Order finding that DuPont had "breached their license agreement with Monsanto by stacking OGAT with RR (Ex. B); another order dated June 6, 2012 finding that DuPont's contentions that the license permitted it to research and develop the same stack was "not tenable", "illogical" and "nonsensical" and that Monsanto was not required to provide regulatory

letters of access for the stacked product (Ex. C) ; a June 29, 2012 order finding that DuPont stacking of OGAT with RR was not otherwise permitted under the safe harbor provision of the Hatch-Waxman Act (Ex.D); and the District Court's December 21, 2011 Sanctions Order (the "Sanctions Order").

66.     On Aug. 1, 2012, an eight person jury deliberated for less than an hour and returned its verdict in the patent trial finding Monsanto's patent was valid and willfully infringed by DuPont and awarded damages to Monsanto of $1 billion.

67.     That same day DuPont issued a statement that it strongly disagreed with the verdict. DuPont asserted  that there "were several fundamental errors in the case which deprived the jury of important facts and arguments and led to the disappointing outcome.  DuPont will appeal at the earliest possible opportunity and expects to overturn this verdict."  DuPont further stated that:

> DuPont believes that the evidence presented during the trial demonstrated clearly that Monsanto's Roundup Ready® soybean patent (RE 39,247) is invalid and unenforceable and that Monsanto intentionally deceived the United States Patent and Trademark Office on several occasions as it sought patent protection.  Further, DuPont believes that the damages awarded of $1 billion are unjustified, particularly considering that Pioneer has never sold a single Optimum® GAT® seed and has no plans to do so in the future.  DuPont's license to sell Roundup Ready® soybeans remains in place and is not impacted by this verdict," said DuPont Senior Vice President and General Counsel, Thomas L. Sager.
>
> Several aspects of Monsanto's misconduct involving this patent, which were not tried in this case, will be presented to a different jury as part of DuPont's antitrust and patent misuse case against Monsanto in September 2013.
>
> DuPont is and always has been committed to innovation and providing farmers with diverse technology options.  We continue to stand by our position that we did not infringe the Roundup Ready® soybean patent and that the Monsanto patent is invalid.

68.     After the trial, Monsanto moved to unseal the documents sealed pursuant to the June 28, 2012 Order.  Monsanto argued that the Sanctions Order should be disseminated to the

public in order to undo damage caused by DuPont's media assault against Monsanto.  Monsanto argued that unsealing the Sanctions Order would help it inform the public that DuPont falsely asserted that it had stacking rights.  Monsanto argued that by allowing the Sanctions Order to remain sealed would merely allow DuPont to continue to perpetrate its fraud.  DuPont opposed the unsealing of the Sanctions Order.

69.     On November 16, 2012, the District Court issued a memorandum and order unsealing the documents sealed pursuant to the June 28, 2012 Order (which included the Sanctions Order).

70.     The Sanctions Order is considerably detailed and describes how DuPont lied to the District Court and investors about its right to use Monsanto seed technology as a central part of its defense in the patent litigation.  For example, the Sanctions Order states that:

- Defendants knew that the 2002 License Agreements with Monsanto prohibited DuPont from stacking and commercializing glyphosate-tolerant traits but "notwithstanding this knowledge [Du Pont], throughout two years of litigating the matter, stated that they negotiated for stacking rights and always believed they had those rights."

- "[T]he egregiousness of [Du Pont's] behavior and the lack of remorse" displayed for its wrongdoing "convinced the Court that only the most severe sanctions would deter their misconduct and preclude them from continuing their abuse of the judicial process."

- While the Sanctions Order remained under seal DuPont had "been able to continue their public relations spin" noting that even after the August 1, 2012 verdict, DuPont still continues to represent to the public that Monsanto's patent was "invalid and unenforceable that that Monsanto has intentionally deceived the United State Patent and Trademark Office…."

- DuPont and its attorneys had "knowingly perpetrated a fraud against the Court, and unreasonably protracted the patent litigation to the prejudice of Monsanto. Consequently, the Court finds that [DuPont's] objection, that unsealing the Order would prejudice other litigation between the parties, gratify private spite, and confer competitive advantage, to be an ironic attempt to wield the Protection Order as both a shield and a sword.  The public is entitled to a full disclosure of the Defendant's fraud, which unduly delayed resolution of this litigation."

71.     The findings in the Sanctions Order also included documents belated produced by DuPont showing that Defendants made false representations to the Missouri District Court about issues critical to DuPont's breach of contract defense and antitrust counterclaims.

72.     The Missouri District Court found that DuPont knowingly and in bad faith made false misrepresentation to the Court that are clearly refuted by its own internal documents. DuPont had been making false representations to the Court for over a year about critical issues to its breach of contract defenses and counterclaims.   The Missouri District Court found that DuPont showed "no remorse for their wrongdoing but to compound the seriousness of their behavior, insist on maintaining their bogus arguments despite the *overwhelming evidence* that those arguments are directly contradicted by the facts."

73.     The Missouri District Court found that striking significant portions of DuPont's Second Amended Answer and Counterclaims was the only means to deter the continuing misconduct.

**THE DEFENDANTS' LEGAL DUTIES**

74.     In its most recent Proxy Statement, filed with the SEC on March 16, 2012, DuPont states as follows with regard to the active role played by its Board:

> **Board's Role in the Oversight of Risk Management**
>
> ***The Board has an active role, directly and through the Board's committee structure, in the oversight of the Company's risk management efforts***. It identifies the set of key risks to be monitored by the Board on a recurring basis, and regularly reviews and discusses with members of management information regarding the Company's business disruption, economic, environmental, ***legal***, process safety, regulatory, reputational, strategic, technological and other risks, their potential impact, and the Company's risk mitigation efforts. Each Board committee plays a key role in overseeing the Company's management of risks that are within the committee's area of focus.

By way of example: The Compensation Committee is responsible for overseeing the management of risks relating to the Company's executive compensation practices. The Audit Committee oversees management of accounting, auditing, external reporting and internal control risks. The Corporate Governance Committee addresses risks associated with director independence and potential conflicts of interest. The Environmental Policy Committee focuses on risks associated with emerging regulatory developments related to the environment. The Science and Technology Committee considers key research and development initiatives and the risks related to those programs.

***Although each committee is responsible for overseeing the management of certain risks, the full Board is regularly informed by its committees about such risks***. This enables the Board and its committees to coordinate risk oversight and the relationships among the various risks.

75.     It may be reasonably presumed that each Board member did his or her duty as described above, and was actively aware of the legal ramifications of DuPont's actions, both with regard to the development of OGAT, and with regard to the ensuing litigation with Monsanto.

76.     Defendants have fiduciary duties to DuPont and its shareholders, including the duties of care and loyalty.  By reason of their positions as directors and/or officers of the Company, and their ability to control the business and corporate affairs of the Company, Defendants owe and owed the Company and its shareholders the obligations of trust, loyalty, good faith, and due care and were and are required to use their utmost ability to manage DuPont in an honest manner, and within the confines of the law.

77.     According to DuPont Board of Directors Corporate Governance Guidelines, as directors of DuPont, the Director Defendants have "an active responsibility for broad corporate policy and overall performance of the Company through oversight of management and stewardship of the Company to enhance the long-term value of the Company for its stockholders and the vitality of the Company for its other stakeholders. In carrying out its responsibility, the

Defendants have "specific functions, in addition to the general oversight of management and the Company's business performance, including…***ensuring processes are in place to maintain the integrity of the Company….***"

78.     DuPont's website also details the Code of Business Conduct and Ethics for the DuPont Board of Directors which has been in place since February 2004.  "The Code is intended to help foster the highest ethical standards, integrity and accountability; focus the Board and each director on areas of potential ethical risk and conflicts of interest; provide guidance to directors to help them recognize and deal with ethical issues; and establish reporting mechanisms."  Under a section entitled *Compliance with Laws, Rules and Regulations; Fair Dealing*, Defendants are required to "comply with all applicable laws, rules and regulations, including insider-trading laws. Directors shall deal fairly with the Company's customers, suppliers, ***competitors*** and employees and shall not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing-practices."

79.     Under Delaware law, failure to act in good faith includes actions where a fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, where the fiduciary intentionally fails to act in the face of a known duty to act, or where the fiduciary acts *knowing* that he or she is not fully informed about a matter which requires a decision, demonstrating a conscious disregard for his or her duties.

## DEMAND IS EXCUSED AS FUTILE

80.     Plaintiff incorporates by reference herein as if set forth fully herein each and every allegation set forth in the paragraphs of this Complaint.

81.     Plaintiff has made no demand on the DuPont Board to commence an action in connection with wrongs alleged herein because such a demand would be futile and useless, and therefore is excused.

82.     DuPont's OGAT development program was part of a major corporate effort that, if successful, would yield great benefits to DuPont, and diminish DuPont's dependence on Monsanto and its technologies.

83.     The DuPont Board's knowing acquiescence in the course of unlawful conduct described herein is an affirmative breach of fiduciary duty.  The DuPont Board could not have believed that DuPont was justified in stacking OGAT with Roundup Ready, because there was no credible evidence it had such rights.  The Board's loyalty is to the corporation, not to management.  Here, the DuPont Board lost sight of its mandate and its responsibilities, and acquiesced in unlawful legal maneuvers and deceptive public statements in conscious disregard of its obligations.  Having created DuPont's legal woes (along with management), the Board cannot be deemed independent enough to consider a demand to bring this action.  A demand would obviously be futile.

84.     The Board members face a substantial likelihood of personal liability for some or all of the harm DuPont has and will suffer.  Given the potential billions of dollars DuPont could be made to pay for violating Monsanto's legal rights the Board members knew what Monsanto's rights were or alternatively, consciously failed to learn what they were, permitting an intentional infringement.  Once the Board members did learn of Monsanto's rights, it failed to take proper

24

action to bring DuPont into compliance with its obligations. Instead, it permitted egregious misconduct aimed at covering up and obfuscating DuPont's wrongful activities. This Board acquiescence extended to permission to top executives to issue press releases containing "spin", designed to deceive the public.

85.     In reaction to the Sanctions Order, the Board took no known actions against any of the malefactors.   It even approved an increase in Kullman's compensation, despite her role in the willful infringement and its aftermath.

86.     The Board has failed to enact a meaningful compensation "Clawback Policy" to redress  wrongdoing. Its policy is so narrow that it provides for no redress for even intentional violations of law which may cost DuPont billions of dollars, so long as such violations do not involve a financial restatement.  Many other companies have adopted broader "if you don't earn it, return it" policies, which serve as effective deterrents to all forms of wrongdoing.  This Board's narrow and ineffectual Clawback Policy shows that it is not serious about policing management misconduct.

87.     As the District Court pointed out in its Sanctions Order, the parties to the Missouri Monsanto Litigation were "huge multi-national corporations involved in high-stakes litigation.  Discovery has been expansive and marked by bitter exchanges in depositions, hearing and court filings."   DuPont's inside and outside counsel would have reported regularly to Defendants regarding the status of the litigation.

88.     Defendants were aware of the Missouri Monsanto Litigation and as part of their duty of loyalty were required to stay informed about litigation that can have a financial and/or business impact on the Company's financial condition and reputation.  It may be reasonably presumed that they did so, given the high profile, high stakes nature of the dispute.

89.     The Missouri Monsanto Litigation was described in DuPont's Form 10-K for the year ended December 31, 2010 and filed with the Securities and Exchange Commission ("SEC") on February 8, 2011.  The 2010 Form 10-K was quick to point out that DuPont had filed an answer and counterclaims, including patent misuse and antitrust claims.  The Form 10-K also noted several that the Missouri District Court rulings about  that the license agreements between the companies but noted that none of these rulings impacted the Company's separate antitrust and patent fraud claims and that these claims were proceeding.

90.     However, after the December 21, 2011 Sanctions Order, any reference to the Missouri Monsanto Litigation was removed from the Form 10-K for the year ended December 31, 2011 filed with the SEC on February 9, 2012.  The 2011 Form 10-K only contains  a cryptic reference to "various litigation matters, including, but not limited to, product liability, patent infringement, antitrust claims." The 2011 Form 10-K was silent regarding the Sanctions Order that striking significant portions of DuPont's Second Amended Answer and Counterclaims and holding that this was the only means to deter the continuing misconduct by the Company.

91.     Director Defendant each signed the Company's 10-Ks and were aware that there were  DuPont omitted any reference to the pending Missouri Monsanto Litigation and the Sanctions Order striking significant portions of DuPont's counterclaims.

92.     There was no disclosure of the Missouri Monsanto Litigation in any of the Company's Form 10-Qs until the September 2012 Form 10-Q. Finally, in the Company's Form 10-Q for the Quarter ending September 2012, the Company made the following disclosure.

*Monsanto Patent Dispute*

On August 1, 2012, a St. Louis, Missouri jury awarded $1,000, in damages to Monsanto on its claims that the company willfully infringed Monsanto's RE 39,247 patent directed to Roundup® Ready® soybean seed technology. The company intends to appeal this verdict when it is appropriate to do so. The

company believes that it will prevail on appeal. Accordingly, as of September 30, 2012, no amounts have been accrued related to this matter.

Monsanto alleged that by combining Pioneer's Optimum® GAT® trait with Monsanto's patented Roundup® Ready® trait, Pioneer violated its 2002 Amended and Restated Roundup® Ready® Soybean License Agreement and, in doing so, infringed Monsanto's RE 39,247 patent. The company has never sold soybeans containing a combination of the Optimum® GAT® and Roundup® Ready® traits and discontinued in 2011 its commercialization efforts for such soybeans.

93.     Defendants are incapable of objectively evaluating a pre-suit demand.   Even with knowledge of the Sanctions Order setting forth evidence that the Defendants knew that DuPont had willfully infringed on Monsanto's patent and that the Missouri District Court had found that DuPont had perpetrated a fraud on the Court and the public, Defendants continue to set their "public spin" that DuPont did nothing wrong and would prevail on appeal.

94.     The Sanctions Order found that DuPont's "fight-to-the-death" mentality clouded Defendants' judgment and that notwithstanding the "clear and unmistakable content of the documents that clearly and convincingly show that Defendants knew of the 2002 license Agreements stacking restrictions, they nevertheless persisted to this day, in advancing false claims that they always believed that they had the right to stack RR and OGAT traits and commercialize this stack.  They claimed excuse is not plausible.  Defendants have knowingly committed a fraud upon the Court."

95.     Defendants consciously and purposely by acting to subvert and/or failing to take any action to investigate and/or stop the improper conduct alleged herein including knowingly making misrepresentations to the Missouri District Court, Defendants allowed DuPont to act in bad faith and to suffer substantial damages as a result of it bad acts.

96.     By allowing this kind of egregious behavior to continue to more than two years, it cannot not be expected the Defendants will commence an action in connection with wrongs alleged herein.

97.     Notwithstanding the $1 billion judgment against the Company and the possibility of even greater damages in the way of monetary sanctions, Defendants have not established any financial contingencies attributed to the Missouri Monsanto Litigation.  The 2011 Form 10-K states that:

> Management makes adjustments to these accruals to reflect the impact and status of negotiations, settlements, rulings, advice of counsel and other information and events that may pertain to a particular matter. Predicting the outcome of claims and lawsuits and estimating related costs and exposure involves substantial uncertainties that could cause actual costs to vary materially from estimates. In making determinations of likely outcomes of litigation matters, management considers many factors. These factors include, but are not limited to, the nature of specific claims including unasserted claims, the company's experience with similar types of claims, the jurisdiction in which the matter is filed, input from outside legal counsel, the likelihood of resolving the matter through alternative dispute resolution mechanisms and the matter's current status. Considerable judgment is required in determining whether to establish a litigation accrual when an adverse judgment is rendered against the company in a court proceeding. **In such situations, the company will not recognize a loss if, based upon a thorough review of all relevant facts and information, management believes that it is probable that the pending judgment will be successfully overturned on appeal**.

98.     The Board, having joined with management in its positions, is now jointly overseeing an appeal. It cannot therefore independently evaluate, bring, and prosecute this action.

99.     Defendants because of their positions of control and authority of DuPont, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with DuPont, each of the defendants had access

to material, adverse, non-public information about the Missouri Monsanto Litigation, the Sanctions Order and the financial condition, operations and future business prospects of DuPont, including, without limitation, the fraud in which the Defendants caused DuPont to engage.

100.     Thus, the Individual Defendants are incapable of objectively evaluating a pre-suit demand due to personal interests.   Accordingly, any demand upon the Board would be futile.

## COUNT I

### (Breach of the Fiduciary Duty Against the Individual Defendants)

101.     Plaintiff incorporates by reference herein each and every allegation contained above as though fully set forth herein.

102.     At all relevant times, under Delaware law, Defendants were under a fiduciary duty to act loyally and with due care.  The conduct described herein constitutes a clear breach of fiduciary duty on the part of Defendants

103.     As directors and/or officers of DuPont, the Defendants owe to DuPont and its stockholders a fiduciary duty of loyalty.  Their fiduciary duty of loyalty required the Individual Defendants to place the interests of DuPont and its stockholders above the interests of feckless management when making decisions on behalf of the Company.  The Defendants also owe to the Company fiduciary duties of care, requiring them to act with the care an ordinarily prudent person in a like position would use under similar circumstances.

104.     Defendants also have the duty to oversee its in house and outside attorneys in connection with a major litigation with one of the Company's biggest competitors and to ensure that they are not breaching their fiduciary duties to the Company.

105.    Additionally, Defendants have implemented a reasonable system of controls designed to inform them if DuPont is not being operated in conformity with applicable law, and would have known from the operation of such control mechanisms that DuPont had no credible defense to Monsanto's claims.   Defendants had a duty to react in good faith to reports or indications that DuPont or its representatives or employees were engaging in unlawful or other improper behavior.   By approving and/or consciously acquiescing in misconduct, Defendants consciously and purposefully acted in violation of the Company's own internal policies and Code of Business Conduct and Ethics.

106.    Each of the Defendants consciously violated the Company's own Code of Business Conduct and Ethics which requires that the "Directors shall deal fairly with the Company's customers, suppliers, competitors and employees and shall not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing-practices."

107.    Each Defendant knew or recklessly disregarded that DuPont and its in house and outside lawyers were perpetrating a fraud on the District Court and the public.   In breach of the Company's Code of Business Conduct and Ethics Defendants did not deal fairly with Monsanto and certainly not with the District Court.   In fact, the District Court found that DuPont's false representations "compromised the integrity of the case and abused the judicial process."

108.    Each of the Defendants authorized, or by conscious abdication of duty permitted the Company to misrepresent, manipulate and conceal to the public and the District Court that it did not have any had stacking right under the 2002 License Agreements.   These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

109.    The statements made by the Defendants and published in the Company's press releases and in other media reports, and reproduced herein were materially false and/or materially misleading at the times they were published, and were known to the Defendants to be false, or were deliberately disregarded as such, for the following reasons:

   a.    Defendants knew that DuPont's counterclaims and antitrust claims in response to the Missouri Monsanto Litigation were based upon false representations to the Missouri District Court.

   b.    Defendants knew that the District Court had struck DuPont's defenses and counterclaims because of DuPont's continued misrepresentations to the public and the Court regarding its rights under the 2002 License Agreements.

110.    Based on the foregoing, Defendants had no reasonable basis for issuing a press release after the jury verdict stating that "Monsanto's Roundup Ready® soybean patent (RE 39,247) is invalid and unenforceable and that Monsanto intentionally deceived the United States Patent and Trademark Office on several occasions as it sought patent protection".

111.    In fact, in the November 16, 2012 Order the District Court found that by allowing the Sanctions Order to remain sealed would allow Defendants to continue to stand by their position that they did not infringe on Monsanto's patent and to continue their "public relations spin."

112.    Defendants breached their fiduciary duties consciously and purposely by acting to subvert and/or failing to take any action to investigate and/or stop the improper conduct including knowingly making misrepresentations to the District Court in connection with the Missouri Monsanto Litigation.

113.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, DuPont has sustained and will continue to sustain significant reputational and monetary damages.

114.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

115.    Plaintiff, on behalf of DuPont, has no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring that Defendants have breached their fiduciary duties to DuPont;

B.      Declaring that Plaintiff may maintain this action on behalf of DuPont and that Plaintiff is an adequate representative of the Company;

C.      Determining that this action is a proper derivative action maintainable under the law and demand is excused;

D.      Determining and awarding DuPont the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

E.      Directing DuPont to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

F.      Awarding to Plaintiff the costs and disbursement of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

COOCH AND TAYLOR, P.A.


/s/ *Blake A. Bennett*
BLAKE A. BENNETT (#5133)
GREGORY F. FISCHER (#5269)
The Brandywine Building
1000 West St., 10th Floor
Wilmington, DE 19899-1680
(302) 984-3800
*Attorneys for Plaintiff*

DATED:  January 16, 2013


**OF COUNSEL:**

**ABBEY SPANIER RODD & ABRAMS LLP**
Nancy Kaboolian
Richard B. Margolies
212 East 39th Street
New York, NY 10016
Telephone: (212) 889-3700
Fax:  (212) 684-5191

**LAW OFFICES BERNARD M.GROSS**
Deborah R. Gross
Susan R. Gross
Suite 450, Wanamaker Building
100 Penn Square East
Philadelphia, PA  19107
Telephone: 215-561-3600
Fax: 215-561-3000

**PASKOWITZ LAW FIRM, P.C.**
Laurence D. Paskowitz
208 East 51st Street
Suite 380
New York, New York 10022
Telephone: 212-685-0969
Fax: 212-685-2306