IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT ZOMOLOSKY, derivatively on behalf of E.I. DU PONT DE NEMOURS AND COMPANY, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 13-94-SLR |
| ELLEN KULLMAN, LOIS D. JULIBER, CURTIS J. CRAWFORD, RICHARD H. BROWN, MARILLYN A. HEWSON, ROBERT A. BROWN, BERTRAND P. COLLOMB, ALEXANDER M. CUTLER, WILLIAM K. REILLY, SAMUEL W. BODMAN, and JOHN T. DILLON. | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and, | ) ) | |
| E.I. DU PONT DE NEMOURS AND COMPANY | ) ) ) ) | |
| Nominal Defendant. | ) | |

---

Blake A. Bennett, Esquire and Gregory F. Fischer, Esquire of Cooch and Taylor, P.A., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Nancy Kaboolian, Esquire and Richard B. Margolies, Esquire of Abbey Spanier, LLP, and Deborah R. Gross, Esquire of Law Offices Bernard M. Gross, and Laurence D. Paskowitz, Esquire of Paskowitz Law Firm, P.C.

Lewis H. Lazarus, Esquire, Joseph R. Slights, III, Esquire, and Thomas E. Hanson, Jr., Esquire of Morris James LLP, Wilmington, Delaware. Counsel for Defendant Ellen Kullman. Of Counsel: Evan R. Chesler, Esquire of Cravath, Swaine & Moore LLP.

Kevin G. Abrams, Esquire and Steven C. Hough, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware. Counsel for Defendants Lois D. Juliber, Curtis J. Crawford, Richard H. Brown, Marillyn A. Hewson, Robert A. Brown, Bertrand P. Collomb, Alexander M. Cutler, William K. Reilly, Samuel W. Bodman, and John T. Dillon. Of

Counsel: David E. Kendall, Esquire, Douglas R. Marvin, Esquire, and Ana C. Reyes, Esquire of Williams & Connolly LLP for Defendants Lois D. Juliber, Curtis J. Crawford, Richard H. Brown, Marillyn A. Hewson, Robert A. Brown, Bertrand P. Collomb, and Alexander M. Cutler. Charles Bachman, Esquire, and Edward N. Moss, Esquire of O'Melveny & Myers LLP for William K. Reilly, Samuel W. Bodman, and John T. Dillon.

Michael A. Pittenger, Esquire, Donald J. Wolfe, Jr., Esquire, and Jennifer C. Wasson, Esquire of Potter Anderson & Corroon LLP and Edward P. Welch, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware. Counsel for Nominal Defendant El DuPont De Nemours and Company. Of Counsel: Thomas J. Nolan, Esquire and Lance E. Etcheverry, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP.

**MEMORANDUM OPINION**

Dated: September 12, 2014
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On January 16, 2013, plaintiff Robert Zomolosky ("Zomolosky"), as a shareholder, filed this action derivatively on behalf of E.I. du Pont de Nemours and Company ("DuPont"), a Delaware corporation, against certain present and former members of DuPont's board of directors. (D.I. 1) On March 18, 2013, Zomolosky amended the complaint. (D.I. 9) After defendants filed a motion to dismiss (D.I. 23), Zomolosky filed a second amended complaint ("SAC") on May 31, 2013. (D.I. 28) Zomolosky alleges demand futility and breach of fiduciary duty regarding defendants' conduct relating to a litigation with Monsanto Company ("Monsanto"). (D.I. 28) Presently before the court is defendants' motion to dismiss the second amended complaint under Federal Rules of Civil Procedure 23.1 and 12(b)(6). (D.I. 29) The court has jurisdiction pursuant to 28 U.S.C. § 1332.

## II. BACKGROUND

### A. The Parties

Plaintiff is a Pennsylvania citizen and has been a DuPont shareholder throughout the time of the alleged misconduct. (D.I. 28 at ¶ 15) Nominal defendant DuPont is a Delaware corporation and a world leader in science and innovation in several disciplines, including agriculture and food development. (*Id.* at ¶ 32) On August 8, 1997, DuPont acquired a 20% interest in, and entered into a "research alliance" with, Pioneer Hi-Bred International ("Pioneer"). On March 15, 1999, Dupont acquired the remaining shares of Pioneer Hi-Bred International ("Pioneer acquisition"). (D.I. 28 at ¶ 33)

The individual defendants are present and former members of DuPont's board of directors ("board"). Defendant Ellen Kullman ("Kullman") has served as Chief Executive Officer since January 2009, director since 2008, and Chair of the Board of Directors since 2009. Kullman was president from October 1 through December 31, 2008. Kullman has also served as the executive vice president and a member of DuPont's Office of the Chief Executive. (*Id.* at ¶ 17) Defendant Lois D. Juliber ("Juliber") has been a director since 1995 and is a member of DuPont's Compensation and Corporate Governance committees. (*Id.* at ¶ 18) Defendant Curtis J. Crawford ("Crawford") has served as a director since 1998 and is a member of DuPont's Compensation and Science and Technology committees. (*Id.* at ¶ 19) Defendant Richard H. Brown ("Richard Brown") has served as a director since 2001 and is a member of DuPont's Compensation and Corporate Governance committees. (*Id.* at ¶ 20) Defendant Marillyn A. Hewson ("Hewson") has served as a director since 2007 and is a member of DuPont's Environmental Policy, Audit and Compensation committees. (*Id.* at ¶ 21) Defendant Robert A. Brown ("Robert Brown") has served as a DuPont director since 2007 and is a member of DuPont's Environmental Policy, Audit and Science and Technology committees. (*Id.* at ¶ 22) Defendant Bertrand P. Collomb ("Collomb") has served as a DuPont director since 2007 and is a member of DuPont's Environmental Policy and Corporate Governance committees. (*Id.* at ¶ 23) Defendant Alexander M. Cutler ("Cutler") has served as a DuPont director since 2008 and is a member of DuPont's Compensation and Corporate Governance committees. (*Id.* at ¶ 24) Defendant William K. Reilly ("Reilly") served as a director from 1993 until 2012, during

2

which time he was also a member of DuPont's Corporate Governance, Environmental Policy and Science and Technology committees. (*Id.* at ¶ 25) Defendants Kullman, Juliber, Crawford, Richard Brown, Hewson, Robert Brown, Collomb, Cutler, and Reilly signed DuPont's 10-K forms for December 31, 2010 through 2011. (*Id.* at ¶¶ 17-25)

Defendant Samuel W. Bodman ("Bodman") served as a director from 2009 until 2011 and was a member of DuPont's Compensation, Corporate Governance, Environmental Policy and Science and Technology committees. (*Id.* at ¶ 26) Defendant John T. Dillon ("Dillon") served as a director from 2004 until 2011 and was a member of the DuPont's Audit, Compensation and Science and Technology committees. (*Id.* at ¶ 27) Bodman and Dillon signed DuPont's 10-K forms for December 31, 2010. (*Id.* at ¶¶ 26-27)

## B. The Technology

Monsanto is a leading global provider of agricultural products for farmers; it manufactures Roundup brand glyphosate herbicides.[1] (D.I. 28 at ¶ 34) Monsanto markets "Roundup Ready" seed products (including corn and soybeans),[2] which are glyphosate-resistant. Monsanto continues to develop new patented versions of Roundup Ready crops.[3] (*Id.* at ¶ 35) By about 2008, roughly 90% of soybean and cotton seeds were Roundup Ready, with corn seeds almost as high. (*Id.* at ¶ 37)

---

[1] Monsanto's patent protection for glyphosate has lapsed.

[2] Monsanto owns patents protecting this technology through 2014.

[3] In 2001, DuPont had a 40 percent share of the U.S. corn market and Monsanto had 10 percent. By 2008, Monsanto had increased its share to 36 percent and DuPont had 30 percent. Monsanto and DuPont also compete in the soybean market, with Monsanto having a 28 percent share, and DuPont a 36 percent share. (D.I. 28 at ¶ 38)

3

Beginning in 2005, DuPont and Pioneer began developing an herbicide-resistant technology, Optimum GAT ("OGAT"), to compete with Monsanto, investing almost $4 billion on research and development. DuPont planned to gradually phase out the Roundup Ready seed varieties and replace them with OGAT varieties. On July 2, 2007, DuPont announced that it had completed regulatory submissions to the U.S. Food & Drug Administration and the U.S. Department of Agriculture for its OGAT trait in corn. On October 17, 2007, DuPont issued a press release stating it was "preparing to launch its new Optimum™ GAT™ trait in soybeans, . . . [and the] trait also will be introduced in corn and other crops." (*Id.* at ¶¶ 37, 60-69)

By July 2007, OGAT test results revealed significant problems and DuPont began considering alternatives. A presentation to DuPont's former CEO and Chairman of the Board, Charles Holliday, Jr. ("Holliday"), discussed the test results and an alternative, stacking the product with Roundup Ready. In 2008, DuPont recognized that it would not be able to launch OGAT as a standalone product and began efforts to develop a stacked product using OGAT and Roundup Ready, called GAT Roundup Ready Stack ("GRS"). DuPont and Pioneer described the potential new product as "Optimum GAT/RR" at a March 2009 investor conference. (*Id.* at ¶¶ 40-42, 70-76)

### C. Licenses and Litigation

#### 1. 1993 Development agreement and 1997 Pioneer/Monsanto litigation

On July 1, 1993, Monsanto and Pioneer entered into a license agreement to develop a genetically engineered elite corn seed using Bt genes ("1993 development

4

agreement"). The 1993 development agreement granted Pioneer a limited license of patent rights relating to Bt genes. By December 1996, Pioneer was selling a Monsanto developed corn product and had paid Monsanto $28 million under the development agreement. On March 27, 1997, Pioneer sued Monsanto for violations of the 1993 development agreement ("1997 Pioneer/Monsanto litigation")[4] in the United States District Court for the Eastern District of Missouri. Monsanto counterclaimed alleging Pioneer was illegally stacking Monsanto's Bt corn technology.

In July 2000, Pioneer documents produced to Monsanto indicated that Pioneer knew that it did not have stacking rights; such position was contrary to the one taken by Pioneer at trial. On August 23, 2000, a jury found in favor of Monsanto ("1997 Pioneer/Monsanto verdict") and the court entered judgment for $11 million.[5] The court sanctioned Pioneer for discovery misconduct relating to Pioneer's improper stacking activities and awarded attorney fees. (*Id.* at ¶¶ 43-51)

## 2. 1999 DuPont/Monsanto Roundup Ready litigation and 2002 license agreement

DuPont and Monsanto litigated an action "involving rights to use Roundup Ready" in 1999-2002,[6] with Monsanto prevailing ("1999 DuPont/Monsanto Roundup Ready litigation"). According to plaintiff at bar, "Monsanto licensed its technology to Pioneer in 1992, but Pioneer's acquisition by DuPont terminated the license." (*Id.* at 12

---

[4]*Pioneer Hi-Bred Int'l v. Monsanto Co.*, Civ. No. 97-1609-ERW (E.D. Mo. 1997).

[5]$10 million for a missed payment by Pioneer.

[6]Plaintiff does not provide the citation for this case.

5

n.3, ¶ 56) After this litigation, in 2002, Monsanto entered into a license agreement with DuPont and Pioneer ("2002 license agreement"), giving Pioneer the right to manufacture and sell soybean and corn seed with the Roundup Ready technology. (*Id.* at ¶¶ 57-59)

### 3. 2009 Monsanto/DuPont patent litigation

In August 2008, Holliday called Monsanto's CEO, Hugh Grant ("Grant"), to suggest that the two companies collaborate. Holliday admitted that DuPont was falling behind in the race to engineer a better soybean. On August 11, 2008, DuPont proposed a license to Monsanto seeking "a full suite of rights to [Roundup Ready technology]" and "stacking and out-licensing rights." Monsanto responded by requesting a royalty of $1.5 billion. No agreement was reached. (*Id.* at ¶¶ 77-78)

On December 23, 2008, in an SEC filing, Monsanto disclosed that it had "entered into a dispute resolution process" with Pioneer regarding Pioneer's plans to stack Monsanto's Roundup Ready technology. Monsanto stated that it "believe[d] that Pioneer [was] not authorized to make this genetic combination, and [it was] seeking to prevent non-consensual use of [its] proprietary technology absent appropriate terms including compensation for providing access to such technology."[7] (*Id.* at ¶ 80)

On May 4, 2009, Monsanto sued DuPont in the United States District Court for the Eastern District of Missouri, alleging infringement of certain patents related to Monsanto's Roundup Ready technology ("2009 Monsanto/DuPont patent litigation").[8]

---

[7]Niche agricultural publications took note of the dispute. (D.I. 28 at ¶ 81)

[8]*Monsanto Co. v. E.I. Du Pont De Nemours and Co.*, Civ. No. 09-686-ERW (E.D. Mo. 2009). DuPont's counterclaims alleging antitrust violations were subsequently

6

(*Id.* at ¶ 82) During the trial, Dr. John Soper ("Soper"), a director of Soybean Research for DuPont, testified that in 2007 there was evidence that stacking OGAT with Roundup Ready would result in better performing varieties. He also testified to continuing conversations with DuPont's leadership (including Holliday) regarding stacking. Throughout 2007, Soper made numerous presentations to DuPont and Pioneer regarding stacking. (*Id.* at ¶¶ 72, 74-76)

On August 17, 2009, Grant requested that DuPont appoint a special committee of independent directors to investigate the wrongdoing by DuPont in connection with the stacking dispute. Plaintiff at bar alleges that the board did not take the action requested. (*Id.* at ¶ 85) On January 15, 2010, the court granted Monsanto's motion for partial judgment on the pleadings, stating that DuPont and Pioneer were not licensed to create a stacked product containing Roundup Ready and Optimum GAT traits. (*Id.* at ¶ 87)

On December 21, 2011, the court sanctioned DuPont and its counsel for perpetrating a fraud against the court, as there was evidence that DuPont knew, as early as 2002, that the 2002 license agreement prohibited DuPont from stacking Monsanto's technology. (*Id.* at ¶¶ 88-94)

On August 1, 2012, the jury found that DuPont had willfully infringed Monsanto's patents and awarded Monsanto $1 billion ("2009 Monsanto/DuPont litigation verdict"). Subsequently, the parties entered into a settlement agreement of $1.75 billion to Monsanto, with additional royalties on a per-unit basis for continued use of Monsanto's

---

severed into a different action. (*Id.* at ¶¶ 83-84)

technology beginning in 2018 ("2009 Monsanto/DuPont litigation settlement"). After the announcement of the 2009 Monsanto/DuPont litigation settlement, Monsanto shares rose 4.4 percent at $103.79, while DuPont's fell 0.3 percent to $48.97. (*Id.* at ¶¶ 95-96) Plaintiff at bar alleges that the settlement does not give DuPont rights to future Monsanto technologies. (*Id.* at ¶¶ 97-98) "DuPont's expert at trial conceded that had DuPont forthrightly sought licensing rights from Monsanto for research and development purposes, based on precedent Monsanto would have charged as little as $7 million." Any commercialization would have resulted in additional negotiations. (*Id.* at ¶ 99)

### 4. Other factual allegations

DuPont's proxy statement, filed on March 16, 2012, describes that the board "has an active role . . . in the oversight of [DuPont's] risk management efforts" and regularly reviews information regarding "legal" risks with members of management. "Although each committee is responsible for overseeing the management of certain risks, the full Board is regularly informed by its committees about such risks." (*Id.* at ¶ 102) Plaintiff at bar alleges that Brown[9] and Crawford "would have been aware of the OGAT program, its failure and [DuPont]'s willful breach of the Licensing Agreements and infringement of Monsanto's Roundup Ready Patent," by virtue of their service on the board's Science and Technology Committee. (*Id.* at ¶ 103)

Plaintiff also alleges that individuals "directly involved" in the 2009 Monsanto/DuPont patent litigation "reported directly to DuPont Senior Vice President

---

[9]The SAC does not make clear whether it refers to Richard Brown or Robert Brown.

8

and General Counsel, Thomas L. Sager ("Sager"), who reported directly to the Board of Directors." (*Id.* at ¶ 104) Moreover, Barry Estrin ("Estrin"), DuPont's Deputy Chief Intellectual Property Counsel, and Daniel J. Cosgrove, corporate counsel at Pioneer/DuPont, were both actively involved in the 2002 License Agreement negotiations. Estrin regularly reported to P. Michael Walker ("Walker"), Vice President and Assistant General Counsel and Chief Intellectual Property Counsel in DuPont Legal. Walker is responsible for legal policy matters. Walker reported directly to Sager, General Counsel of DuPont. Sager oversaw and directed the litigation with Monsanto. Sager also reported to the board regularly "regarding negotiations surrounding the 2002 [l]icense [a]greement, legal and patent issues regarding the development of OGAT and the ensuing litigation with Monsanto." (*Id.* at ¶¶ 104-06)

## II. STANDARDS OF REVIEW

### A. Federal Rule of Civil Procedure 23.1

Pursuant to Federal Rule of Civil Procedure 23.1(b)(3), a shareholder bringing a derivative action must file a verified complaint that "state[s] with particularity:"

> (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and
> (B) the reasons for not obtaining the action or not making the effort.

Therefore, Rule 23.1 provides a heightened pleading standard. "Although Rule 23.1 provides the pleading standard for derivative actions in federal court, the substantive rules for determining whether a plaintiff has satisfied that standard 'are a matter of state law.'" *King v. Baldino*, 409 Fed. Appx. 535, 537 (3d Cir. 2010) (citing *Blasband v. Rales*, 971 F.2d 1034, 1047 (3d Cir.1992)). "Thus, federal courts hearing

9

shareholders' derivative actions involving state law claims apply the federal procedural requirement of particularized pleading, but apply state substantive law to determine whether the facts demonstrate [that] demand would have been futile and can be excused." *Kanter v. Barella*, 489 F.3d 170, 176 (3d Cir. 2007).

> In this regard, the Delaware Supreme Court has explained that the entire question of demand futility is inextricably bound to issues of business judgment and the standard of that doctrine's applicability.... It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.

*Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), overruled on other grounds by *Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000). "The key principle upon which this area of . . . jurisprudence is based is that the directors are entitled to a presumption that they were faithful to their fiduciary duties." *Beam ex. rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004). Therefore, the burden is on the party challenging a board's decision to establish facts rebutting the presumption that the business judgment rule applies. *Levine v. Smith*, 591 A.2d 194, 205-06 (Del. 1991). By promoting the exhaustion of intracorporate remedies as an alternate dispute resolution over immediate recourse to litigation, "the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations." *Aronson*, 473 A.2d at 811-12.

### B. Federal Rule of Civil Procedure 12(b)(6)

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint

10

must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)). Consistent with the Supreme Court's rulings in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Third Circuit requires a two-part analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Fowler*, 578 F.3d. at 210-11. Second, a court should determine whether the remaining well-pled facts sufficiently show that the plaintiff "has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). As part of the analysis, a court must accept all well-pleaded factual allegations in the complaint as true, and view them in the light most favorable to the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

The court's determination is not whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir.

11

2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## IV. DISCUSSION

There are two tests that may establish demand futility. In cases challenging a board's action, demand is excused if a plaintiff raises a reasonable doubt that a majority of the board was disinterested and independent, or that the challenged acts were a result of the board's valid business judgment. *See Aronson*, 473 A.2d at 814. When a board did not act, refrained from acting or violated its oversight duties, the plaintiff must "create a reasonable doubt that, as of the time the complaint [wa]s filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993); *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008), overruled on other grounds by *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)). Both *Aronson* and *Rales* focus on whether "the directors are incapable of making an impartial decision regarding . . . litigation." *Rales*, 634 A.2d at 932.

Facts showing that the directors would face a "substantial likelihood" of personal liability by complying with a shareholder's demand to pursue litigation may challenge the independence or disinterestedness of directors. *Id.*

12

> Where directors are contractually or otherwise exculpated from liability for certain conduct, "then a serious threat of liability may only be found to exist if the plaintiff pleads a **non-exculpated** claim against the directors based on particularized facts." Where, as here, directors are exculpated from liability except for claims based on "fraudulent," "illegal" or "bad faith" conduct, a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, i.e., that they had actual or constructive knowledge that their conduct was legally improper.

Wood, 953 A.2d at 141 (citing Guttman v. Huang, 823 A.2d 492, 501 (Del. Ch. 2003)).

Plaintiff alleges that the board did not act to prevent infringement of Monsanto's patents and the resulting 2009 Monsanto/DuPont patent litigation,[10] and that the board condoned wrongdoing, e.g., as demonstrated by increasing Kullman's compensation. As to preventing the infringement and subsequent litigation, plaintiff has not pled any action on the part of the board (with the possible exception of acquiescence), therefore, such inaction is properly analyzed under the Rales test.[11] In re Intel Corp. Derivative Litigation, 621 F. Supp. 2d 165, 173 (D. Del 2009) ("The Court cannot address the business judgment of an action not taken and, therefore, should concern itself with what is now known as the Rales test . . . ."). As to Kullman's salary increase, an action, the Aronson test applies.

---

[10] While plaintiff criticizes the board's approval of the litigation settlement, plaintiff specifically states that "the underlying acts that led to the settlement were wrongful," not the settlement itself. (D.I. 33 at 3 n.6)

[11] Plaintiff cites to In re Abbott Depakote S'holder Derivative Litig., 2013 WL 2451152 (N.D. Ill. June 5, 2013), for the proposition that the Aronson test applies to "conscious inaction." Id. at *4, *6 (citing to In re Abbott Labs. Deriv. S'holders Litig., 325 F.3d 795, 806 (7th Cir. 2003)); see also, Westmoreland Company Employee Retirement System v. Parkinson, 2013 WL 4266586 (7th Cir. Aug. 16, 2013). However, in Fagin v. Gilmartin, 432 F.3d 276 (3d Cir. 2005), the Third Circuit rejected the Seventh Circuit's interpretation of "Illinois law (which purportedly follows Delaware law)" and applied the Rales standard to a situation in which the board did not take an action. Id. at 282.

13

## A. Application of the *Rales* test to defendants' alleged inaction

Specifically, plaintiff alleges that making a demand on the board is futile because: (1) a majority of board members knowingly ignored a pattern of unlawful infringement; (2) the board had direct knowledge of infringing activities and permitted them; (3) the infringement scheme was reflected in business plans and updates submitted to the board; (4) the board was aware that DuPont lacked stacking rights from prior unsuccessful litigation, yet the board permitted history to repeat; and (5) the board consciously failed to take steps to protect DuPont and to bring its conduct into conformity with the law. Applying *Rales*, these allegations must establish a reason that the directors would be incapable of making an impartial decision regarding the demand.

### 1. Substantial likelihood of liability for ignoring red flags

Plaintiff seeks to establish that the board members face a "substantial likelihood" of personal liability because of their failure of oversight in the face of the "red flags," including the "repeated infringement settlements" and the culture of "infringe first and litigate later." Under *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996) and its progeny, this is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Id.* at 967. "[L]iability for such a failure to oversee requires a showing that the directors **knew** they were not discharging their fiduciary obligations or that they demonstrated a **conscious** disregard for their duties." *In re Intel*, 621 F. Supp. 2d at 174 (citing *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 122-23 (Del. Ch. 2009)).

While DuPont and Monsanto have been engaged in litigation regarding

14

technology rights, the court will not infer a "pattern of unlawful infringement"[12] when such litigation occurred some ten years prior to the 2009 Monsanto/DuPont patent litigation and was based on different license agreements. (D.I. 28 at ¶¶ 111-13) The fact that several directors (such as Juliber, Crawford, and Reilly) were on DuPont's board at the time of the Pioneer acquisition, the 1997 Pioneer/Monsanto verdict, and the 1999 DuPont/Monsanto Roundup Ready litigation (D.I. 28 at ¶ 126), is of no moment to the court's analysis.[13, 14] The prior litigations concerning the 1993

---

[12]In contrast, in *In re Pfizer Inc. Shareholder Derivative Litigation*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010), the court found demand futile as

> the Complaint detail[ed] at great length a large number of reports made to members of the board from which it may reasonably be inferred that they all knew of Pfizer's continued misconduct and chose to disregard it. These include, for example, the reports to the board of the Neurontin and Genotropin settlements, a large number of FDA violation notices and warning letters, several reports to Pfizer's compliance personnel and senior executives of continuing kickbacks and off-label marketing, and the allegations of the *qui tam* lawsuits.

*Id.* at 460.

[13]Additional arguments by plaintiff, such as, "in 2008, a majority of the present directors signed a Form 10-K explicitly discussing that DuPont in 2007 had paid $725 million to obtain valuable rights from Monsanto it did not have, including rights involving stacking corn" (D.I. 33 at 15) do not cite to the SAC. The court cannot find support for such statements in the SAC and, therefore, does not consider such attorney argument.

[14]Plaintiff's reliance on *In re Pfizer Inc. Shareholder Derivative Litigation*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010), and *Saito v. McCall*, 2004 WL 3029876 (Del. Ch. Dec. 20, 2004), overruled in part, *Lambrecht v. O'Neal*, 3 A.3d 277 (Del. 2010), to argue that knowledge by a director may be imputed to the board in generalized circumstances is misplaced. In *In re Pfizer*, "the allegations of the Complaint evidence misconduct of such pervasiveness and magnitude, undertaken in the face of the board's own express formal undertakings to directly monitor and prevent such misconduct, that the inference of deliberate disregard by each and every member of the board is entirely reasonable." *In re Pfizer*, 722 F. Supp. 2d at 462. In *Saito*, plaintiffs alleged well-pleaded particularized facts that four directors knew of the alleged accounting irregularities.

15

development agreement may not reasonably be characterized as "red flags" disregarded by the directors in allowing certain research and development under the 2002 license agreement.

Plaintiff alleges that, as Kullman provided annual business plans ("business plans"), which included a section regarding new products, the business plans presented by Kullman to the board prior to 2012 would have contained the research status of the standalone product and stacked product." Moreover, a "board letter update" prepared by a team, including Paul Schickler (Pioneer President) and Greg Friedman (Pioneer's Finance Director), also contained information regarding new products. Plaintiff concludes that such documents would have alerted the board to the infringement and potential for subsequent litigation. (D.I. 28 at ¶¶ 120-23) Such documents, as described, would have provided the board with updates on ongoing research and development. However, these allegations are not sufficient for the court to infer that the board members knew that such research was infringing and, therefore, were not discharging their duties or were consciously disregarding such duties.

Holliday's admission in 2008 that DuPont was falling behind and suggestion to Monsanto of collaboration does not equate to knowledge by the board that the ongoing research infringed Monsanto's patent or that such research was not covered by the 2002 license agreement. Similarly, the parties' entrance into dispute resolution proceedings does not necessarily lead to the conclusion that DuPont knew it was infringing. (*Id.* at ¶¶ 114-19)

---

*Saito,* 2004 WL 3029876 at *7, n.68.

16

Plaintiff alleges, in a conclusory fashion, that the board failed to "put in place meaningful policies and procedures" to prevent infringing conduct and obtain an independent legal opinion that DuPont had the rights it claimed. (D.I. 28 at ¶¶ 128-31) DuPont has both in-house and outside counsel, on whom it relied throughout the 2009 Monsanto/Dupont patent litigation. Plaintiff has not proffered factual allegations to support his contention that such reliance was not reasonable. *In re Caremark*, 698 A.2d at 971 (finding that "the Board appears to have been informed by experts that the company's practices while contestable, were lawful. There is no evidence that reliance on such reports was not reasonable. Thus, this case presents no occasion to apply a principle to the effect that knowingly causing the corporation to violate a criminal statute constitutes a breach of a director's fiduciary duty.") Plaintiff also relies on the District Court for the Eastern District of Missouri's order for sanctions (D.I. 28, ex. A) in the 2009 Monsanto/DuPont patent litigation to allege that the directors knew of the infringing conduct. Such order analyzed certain conduct and statements[15] in the context of that litigation. The court declines to import those specific factual conclusions to the present analysis of demand futility.

DuPont's charter[16] absolves the board of personal liability for breaches of fiduciary duty except those based on fraudulent, illegal, or bad faith conduct. (D.I. 32, ex. B at 8) The allegations discussed above are insufficient to infer that the directors

---

[15]Identifying some of the individuals by positions, such as in-house attorneys, but not by name.

[16]The court takes judicial notice of DuPont's charter (D.I. 31). *See, e.g., In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995) (taking judicial notice of a certificate of incorporation in deciding a motion to dismiss).

17

had constructive knowledge that DuPont was infringing and that failure to prevent such infringement was a breach of their fiduciary duties.

## 2. Other allegations regarding whether the board was disinterested and independent

Plaintiff faults DuPont for "not fir[ing] or penaliz[ing] any of DuPont's top executives" and criticizes DuPont's compensation "clawback policy," stating that "[t]his signifies that the Board has decided that patent infringement and misleading a court are not acts it wishes to redress." (D.I. 28 at ¶¶ 132-33) These allegations are conclusory and insufficient to establish demand futility.

## B. Application of *Aronson* test to board conduct

Plaintiff alleges that the board lacks independence as it has knowingly rewarded executives involved in such unlawful conduct, e.g., by increasing Kullman's salary after the 2009 Monsanto/DuPont litigation verdict. (D.I. 28 at ¶ 132) Even if the court were to conclude that such allegations raised a reasonable doubt that Kullman was disinterested and independent, Kullman does not represent a majority of the board. Therefore, this is insufficient to establish demand futility.

## IV. CONCLUSION

For the aforementioned reasons, the court concludes that plaintiff has not established demand futility, and grants defendants' motion to dismiss the SAC in this regard.[17] (D.I. 29) An appropriate order shall issue.

---

[17]The court does not reach defendants' arguments under Federal Rule of Civil Procedure 12(b)(6).

18